## JACKSON v. WHITE et al.

(Circuit Court of Appeals, Fourth Circuit.   June 15, 1911.)

No. 953.

1. APPEAL AND ERROR (§ 1022*)—REVIEW—FINDINGS OF FACT.

Where on questions of fact a special master and the trial judge concur, an appellate court will accept their findings, unless the record shows them to be clearly erroneous.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4015–4018; Dec. Dig. § 1022.*]

2. CORPORATIONS (§ 187*)—"DEBT"—CONSTRUCTION OF AGREEMENT BETWEEN STOCKHOLDERS.

Owners of a majority of the stock of a railroad company sold their holdings under an agreement to pay off all indebtedness of the company and deposited the proceeds of the stock to be paid out in discharge of, such indebtedness on vouchers issued by the directors; the surplus remaining to be divided between them in proportion to their several holdings. *Held*, that the sum which a stockholder had paid for his stock was not a debt of the company, and the directors had no authority to allow and pay a claim therefor as against another stockholder.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 703; Dec. Dig. § 187.*

For other definitions, see Words and Phrases, vol. 2, pp. 1864–1886; vol. 8, p. 7628.]

3. CORPORATIONS (§ 187*)—ACTIONS BETWEEN STOCKHOLDERS—LIABILITY FOR MISREPRESENTATION.

Where stockholders of a corporation joined in a sale of their stock under an agreement to pay the debts of the corporation from the proceeds, statements made by certain of the stockholders to another to induce him to join in the sale, as to the amount which would be required to pay the debts, if made in good faith, did not create a liability on their part because the debts proved to be larger than their estimate.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 703; Dec. Dig. § 187.*]

4. CORPORATIONS (§ 327*)—CONTRACT BY OFFICER—LIABILITY FOR BREACH.

A contract, by which a defendant, who owned a controlling interest in a corporation, agreed to deliver certain of its bonds to complainant's assignor, construed, and *held* to create an indebtedness from such defendant to complainant equal to the par value of such bonds, where they were never issued, but claims by others against the corporation on similar contracts were paid on that basis with defendant's consent as a director.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 327.*]

Appeal from the Circuit Court of the United States for the Northern District of West Virginia, at Parkersburg.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suit in equity by Ida G. Jackson against A. B. White, H. C. Jackson, V. B. Archer, H. B. Nye, Citizens' Trust & Guaranty Company of West Virginia, and Citizens' Trust & Guaranty Company of West Virginia, as trustee. Complainant appeals from the decree. Reversed.

James S. McCluer and Seth T. McCormick (McCluer & McCluer, on the brief), for appellant.

William Beard and William H. Wolfe, Jr. (B. M. Ambler and A. G. Patton, on the briefs), for appellees.

Before GOFF and PRITCHARD, Circuit Judges, and ROSE, District Judge.

ROSE, District Judge. In the summer and early fall of 1901 the complainants and the defendants White, H. C. Jackson, Archer, and Nye held among them more than one-half of the capital stock of the Little Kanawha Railroad Company. They united in a sale for $350,000 of all their holdings to J. T. Blair and E. D. Fulton. Out of this sum the sellers agreed to pay ... id discharge all existing liens and incumbrances and all valid claims and demands of any character whatever against the company. The buyers deposited $350,000 with the defendant the Citizens' Trust & Guaranty Company. The last-named company was to pay this money out in the first place in discharge of the debts of the railroad company upon vouchers made up by its then board of directors. If a demand was made upon the railroad company which the directors did not believe to be valid, the sellers of the stock reserved the right to contest such claim. If they made such contest, they were required to leave in the hands of the trust company a sum of money sufficient to save harmless the buyers from any loss or damage that might arise in consequence of such claim. The surplus, if any, remaining after discharging the debts and liabilities of the company, was to be divided among the sellers in proportion to the number of shares of stock sold by each of them, respectively.

The complainant says that the $350,000 was paid out under the direction of the defendants White, H. C. Jackson, and Archer. She asserts that she did not receive the sum due her, first, as creditor of the company; second, as stockholder therein; third, under a written contract with the defendant H. C. Jackson.

We will consider these contentions in the order above mentioned.

First, as creditor: Among the claims against the railroad company presented to its board of directors was that of W. W. Jackson for $2,000 for services rendered and expenses incurred for the company. This claim the board of directors rejected. W. W. Jackson is the complainant's husband. She says that the claim should have been allowed and not rejected. The special master agreed with her and held that she was entitled to this sum. The court below held that the special master was in this respect in error. In so holding the court below was right. It was right whether the claim of W. W. Jackson was or was not a valid one in his hands as against the company. The record

does not show that this claim was ever assigned to the plaintiff. She has, therefore, in a legal sense, no interest in it.

Second, as stockholder: The number of shares of stock sold to Blair and Fulton was 2,971. At the time such sale was made, 282 shares stood in the name of the complainant. The special master found that 23¼ of these belonged to defendant H. C. Jackson, and had been put in the name of the complainant by mistake, and that the complainant was legally and equitably entitled to 258¾ shares and no more. The report of the special master was in this respect confirmed by the court below. Complainant does not here contest such conclusion.

As the holder of 258¾ shares she is entitled to the same proportion of the surplus remaining after discharging the debts and liabilities of the company as 258¾ bears to 2,971. This is not now denied. Until the filing of the bill in this cause it was ignored. That there is a surplus in which she is entitled to share is now admitted. What that surplus amounts to, or at least what it should amount to, is disputed. Defendants say that the determination by the board of directors of the company that a particular claim was a valid claim against the company is binding upon the complainant. This the complainant denies. She asserts that the defendants White, H. C. Jackson, and Archer caused to be paid claims which they knew were not debts of the company. She contends that the larger part of such sums so improperly expended were paid to some one or the other of the three defendants last named. She says that they are bound to account to her for her share of the sums which they so unlawfully paid out. To the extent that any of the defendants received out of this sum of $350,000 money which he was clearly not entitled to claim under the terms of the agreement with Blair and Fulton, the complainant's contention under the peculiar circumstances disclosed by the record appears to us to be well founded.

To judge justly what was done and how it came to be done it is necessary, if possible, to understand something of the history of the railroad company and of the relation of the three principal defendants to it.

That there was a Little Kanawha Railroad appears to have been due in large part to the defendant H. C. Jackson. With him in the years immediately preceding 1901 were associated the defendants V. B. Archer and A. B. White and, apparently somewhat less intimately, H. B. Nye. Their resources were not adequate to enable them comfortably to finance the project. They at times found it very difficult to raise needed money for the road. The credit of the company had become so impaired that its name on commercial paper rendered the paper nonnegotiable. In other words, its note, even though indorsed by White or Archer or H. C. Jackson, would not be discounted at bank, although the individual notes of those gentlemen would have been. They were accordingly forced to give, in lieu of its paper indorsed by them, their individual notes.

They were hopeful that some day the enterprise would pay handsomely. They knew it had no money at the time. They, or some of

them, kept imperfect accounts of the expenditures and liabilities made or incurred by them for it. In order to raise money when it was sorely needed, sometimes the company and sometimes some of the defendants as individuals made bargains with other people by which such other persons were promised an interest in the securities to be issued by the road under varying terms and conditions classified in the several briefs. When the sale to Blair and Fulton was actually made, the sum received was not sufficient to realize any great expectations. The obligations entered into by the company and by the individual defendants varied in their terms. It was not easy—perhaps it was not possible—to make an exactly equitable distribution of the money received because the varying contracts and engagements could not be reduced to any common denominator. It was largely because of these conditions and difficulties that the present litigation has arisen and the record has expanded into nearly 1,300 printed pages.

The defendants H. C. Jackson and White, and to a somewhat less extent Archer, had borne the burden and heat of the struggle to keep the company out of absolute financial ruin. In order to save the company, H. C. Jackson and White had used their credit and resources to their full limit. For years the company had been ever before them. Their financial future was largely bound up with it. They had labored, spent, and risked for it. It did not seem to them that the complainant's husband, W. W. Jackson, under whom she claimed, had ever been of much use to the company, although in its earlier days he seems to have spent considerable time in writing about it and in talking about it. When the directors or their executive committee were auditing the bills against the company and issuing vouchers for the payment of such bills, they realized that the enterprise was being finally wound up. The hope of large profits which had buoyed them up through many periods of doubt, struggle, and difficulty were now at an end. They not unnaturally thought that they were entitled to have their claims against the company treated in a liberal and generous way. They did not feel that the complainant stood in this respect on the same footing with themselves. This feeling was very natural. It was very human. Nevertheless, in a court of equity the complainant's rights as a shareholder in proportion to the number of shares she held were exactly the same as theirs. If they had any claims as creditors against the company, they were entitled to have them paid. As a stockholder she was entitled to insist that no claims against the company should be paid except those for which the company was liable.

After paying all the claims presented against the company, including those to themselves to which complainant objects, there still remained a surplus of some $16,000. The complainant points to the way in which they dealt with this $16,000 as showing that H. C. Jackson, White, and Archer were at or about the time they passed upon the claims against the company disposed, consciously or unconsciously, to ignore her rights. They distributed this $16,000 among themselves and a certain C. H. Shattuck, who, by the terms of the agreement with Blair and Fulton, had no interest in it. They paid $10,000 of it to

H. C. Jackson, $1,000 to Archer, $2,500 to White, and $2,500 to Shattuck. These payments were not made absolutely. Each one of them, when he withdrew the money from the Citizens' Trust & Guaranty Company, gave a bond executed by the Citizens' Trust & Guaranty Company conditioned that the person who withdrew the money would repay it, if it should be necessary, to pay the debts of the railroad company, or in case the amount so withdrawn was greater than the amount that would be due to the person withdrawing it on final settlement among the stockholders who united in the sale to Blair and Fulton. The bonds so given appear to have been delivered to the persons who withdrew the money. It should be remembered that at the time these withdrawals were made the complainant held more stock than did Archer and something over two-thirds as much as White. She was not given the opportunity to withdraw anything, nor was there any substantial sum left for her to withdraw if she had asked permission to do so.

By the decree below the defendants who made these withdrawals, or authorized them, are required to account to the complainant for her share of the sums so withdrawn. That portion of the decree below has not been appealed from. It has been necessary, however, to refer to this feature of the case because it undoubtedly played a large part in convincing the complainant that she has not received fair and just treatment. It does throw a good deal of light upon the way in which the defendants H. C. Jackson, White, and Archer looked at the complainant and her rights at the time when these transactions took place.

Under such circumstances a court of equity must scrutinize with some care the action taken by these defendants in passing upon the claims.

[1] The complainant says that many of the claims were improperly and unjustly allowed. These objections of the complainant appear to have been all carefully considered by the special master. Most of them he overrules. He frankly states that in many cases the evidence on the question as to the nature and amount of the claim is not altogether satisfactory, but, on the whole, he believes that there is not sufficient evidence to show that the claims which he allows were not valid claims against the company and justly owing by it. His conclusions in these matters have been confirmed by the court below. Where, on questions of fact of this character, the special master and the judge below concur, the appellate court will accept their findings, unless the record shows them to be clearly erroneous. Except in one instance, we see nothing in this record to justify us in coming to any such conclusion.

[2] When the defendant White became a stockholder in the company, he paid $2,500 for his stock. None of the other individual stockholders who sold their stock to Blair and Fulton appear to have paid anything for it. When the directors were dividing the $350,000, Mr. White made a claim on them for the return of this $2,500. They paid it to him. In so doing they paid out $2,500, for what was not a debt of the railroad company and for what they must, if they had thought

about it, have known was not a debt. To this payment the complainant objects. She is entitled to object. There being no controversy over the facts, the question presented to us is one of law purely, and we are of opinion that the special master and the court below erred in not requiring the return by the defendant White of this $2,500.

There are three items as to which the court below overruled the findings of the special master.

H. C. Jackson had made a personal contract with one Gregory for the delivery to Gregory, in certain contingency, of bonds of the railroad company. He paid Gregory $3,000 for a release from this contract. The directors of the railroad company repaid this sum to Jackson out of the $350,000. The special master held this payment was improper.

By an error of calculation the directors overpaid H. C. Jackson $382.52 on salary account. The special master held that this sum should be returned by H. C. Jackson.

$500 was paid the defendant Archer as a retainer to defend probable suits which might be brought against H. C. Jackson by W. W. Jackson, George Mastin, and J. H. Gregory. The special master found that these claims were claims against H. C. Jackson and that the company was under no obligation to defend them.

The learned judge below sustained exceptions made by the defendants to the disallowance by the special master of the above-mentioned claims. We have not the benefit of his statement of the reasons which led him to take such action. As the record stands before us, it seems to us the special master was right, and the defendants who received the above-mentioned sums should be required to return the complainant's share of them to her.

[3] The complainant says that H. C. Jackson and Archer induced her to unite in selling the stock to Blair and Fulton by telling her that the debts of the company did not exceed $276,000. There was actually paid out under the authority of the directors $333,858.86. We have held that $6,382.52 of this amount was improperly paid to H. C. Jackson and White and must be returned by them. Deducting the last-mentioned sum from the total amount originally expended will leave the amount we hold to have been properly paid out for the indebtedness of the company, $327,475.34. Complainant says that this is $51,475.34 more than Archer and H. C. Jackson told her the debts would amount to. She asks that they be required to put her in the position she would have been in had the facts been as she says they represented them to be. In other words, she asks that they be required to pay to her her proportion as stockholder of $51,475.34, or in the neighborhood of $4,500.

It suffices to say that we do not find from the record that H. C. Jackson and Archer, or either of them, in any way bound themselves to complainant to make good any loss she might suffer by reason of the debts of the company exceeding $276,000, nor do we find that at the time they made such representation to her they knew it to be false or made it in reckless indifference as to whether it was true or false. They do appear to have told her that they believed the indebtedness

would not exceed $276,000. There is nothing to show that such statement was not made in good faith. Neither in contract nor in tort is the complainant entitled to recover against H. C. Jackson or Archer, or either of them because of such statement.

There remains for consideration:

Third, complainant's rights under a contract with H. C. Jackson.

[4] The contract in question is dated April 14, 1898. By it, in consideration of $2,500 cash paid by W. W. Jackson and one J. H. Gregory, and the undertaking by the said Gregory to indorse certain notes of the railroad company and an assumption by him of some contingent liabilities on its behalf, H. C. Jackson sold "an undivided one-eighth in the first mortgage bonds of the Little Kanawha Railroad Company on its present mileage of thirty miles, which mortgage provides for the issue of first mortgage bonds in the amount of $15,000 per mile, making the total authorized issue $450,000." These bonds were subject to certain enumerated prior liens aggregating $140,000. By the terms of the contract two-thirds of the one-eighth of the bonds so sold were to go to Gregory and one-third to W. W. Jackson. W. W. Jackson's interest in this contract was subsequently assigned to his wife; the transaction taking the form of an assignment by him of his interest in the contract to H. C. Jackson and of the latter's reassignment of such interest to the complainant.

The complainant says that $140,000, the amount of the prior liens provided for in the contract, should be deducted from the $450,000, the total issue of bonds mentioned in the contract. This leaves a balance of $310,000. 1/24 of $310,000 is $12,916.66, which is the amount that the special master found to be due on this contract from H. C. Jackson to complainant. The defendant H. C. Jackson sets up various defenses to this claim.

First, he says he assumed no personal obligation under the contract of April 14, 1898. Such construction of the contract does not appear to us to be reasonable.

Second, he says that the Cartwright contracts, to which W. W. Jackson assented, made impossible the carrying out of the contract of April 14, 1898. With this contention we cannot agree. By the consent of every one, the Cartwright contracts were ended. It was the obvious intention of all the parties that every one interested should return to the position he or she occupied before those contracts were made. The defendant Archer had a claim against the company for $18,000 of bonds. This claim arose out of an agreement made years prior to the Cartwright contracts. Archer assented to those contracts. When the $350,000 received from Blair and Fulton was distributed, Archer made a claim against the company for the par value of these bonds. H. C. Jackson assented to the payment of this claim. No one then contended that Archer had waived his claim to these bonds because of his assent to the arrangements with Cartwright. Other persons who had claims against the company were in the same position as Archer and were dealt with in precisely the same way. The present reliance of H. C. Jackson upon the Cartwright contracts is quite obviously an afterthought of his counsel.

Third, H. C. Jackson says that the contract of April 14, 1898, was assigned by W. W. Jackson to him and was reassigned by him to the complainant, and the latter assignment expressly released him from any personal liability under the contract of April 14, 1898. We do not so understand the purport of the language of such assignment. In our view the assignment intended to transfer to the complainant whatever rights W. W. Jackson had assigned to H. C. Jackson. H. C. Jackson did not wish to incur any personal liability by reason of the assignment and so said. We do not think it reasonable to assume that any of the parties intended that the complainant should not take under the assignment from H. C. Jackson all that H. C. Jackson had received by the assignment from W. W. Jackson.

Fourth, H. C. Jackson says that the complainant by claiming as a stockholder under the Blair and Fulton option is estopped to demand bonds under the agreement of April 14, 1898. We see no basis for this contention. Her rights as a stockholder arose under a contract of January 12, 1899. This contract was in no wise connected with the contract of April 14, 1898. In consequence of the agreement of January 12, 1899, she became a stockholder. Such agreement did not affect any rights she had acquired under the agreement of April 14, 1898, to demand bonds from H. C. Jackson.

Fifth, H. C. Jackson says that complainant waived any rights that she had to bonds by becoming a party to various option agreements, plans of reorganization, and the like. That result does not seem to us naturally to follow from anything that she did with reference to these agreements.

Sixth, H. C. Jackson says that the complainant is not entitled to any bonds because no bonds were issued. Bonds were not issued because H. C. Jackson, who controlled the company, did not think it expedient to issue them. Doubtless the reason he did not think it expedient to issue them was that he had no reasonable hope of being able to sell any of them. When he came, as director of the company and a member of its executive committee, to settle with Archer, Barstow, and the other persons who had claims against the company, for bonds, he and all the other directors treated these claims as if they were valid claims for an amount of cash represented by their par value.

The special master reached the conclusion that the complainant was entitled to recover from H. C. Jackson upon this contract of April 14, 1898. We think in so doing that the special master was in principle right and that the learned court below was in error in sustaining the exception of the defendant H. C. Jackson to so much of the master's report. Certain modifications, however, in this matter should be made in that report. To carry the $140,000 of prior liens from April 14, 1898, to the time they were paid, say October 14, 1901, a period of three years and six months, must have cost the company at least as much as legal interest on the amount of those liens for that time would have amounted to. If the principal of these liens was entitled to priority over complainant's claim, the interest on them was equally a prior claim. Interest at 6 per cent. for three years and

six months on $140,000 is $29,400. 1/24 of this sum is $1,225. From the amount found by the special master to be due from H. C. Jackson to the complainant should be deducted, therefore, the sum of $1,-225, reducing the amount so due to $11,691.66. Nor do we think that the complainant is entitled to interest on this sum from April 14, 1898, as allowed by the special master. Under the construction put upon the contract by the parties, we do not think that the complainant is entitled to the principal of this sum until the division of the $350,000 received from Blair and Fulton was completed, say December 1, 1901.

We are therefore of the opinion that, with the exceptions herein specially mentioned, the special master's report should be confirmed.

In view of the form in which the special master's report of the adjustments between the complainant and the defendants H. C. Jackson, White, and Archer was made, it will be more convenient for a new calculation to be made in the court below of the sums which in accordance with this opinion and following the principles of the special master's report, should be paid and received by the respective parties. When such calculation is made, interest on the amounts severally to be paid should be brought down to the date at which, in accordance with the mandate of this court, the final decree below shall be passed. It follows that the decree below, in so far as it is inconsistent with what is herein stated, must be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed.